UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA M. COLE,

        Petitioner,

                                 CASE NO. 05-CV-71115-DT

v.                             JUDGE AVERN COHN

                                 MAGISTRATE JUDGE PAUL J. KOMIVES

KENNETH ROMANOWSKI,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION ................................................................ 2
II.    REPORT ......................................................................... 2
    A.   *Procedural History* ....................................................... 2
    B.   *Factual Background Underlying Petitioner's Conviction* ............................. 5
    C.   *Standard of Review* ...................................................... 6
    D.   *Sufficiency of the Evidence (Claim I)* ......................................... 8
        1.   *Clearly Established Law* .............................................. 8
        2.   *Involuntary Manslaughter under State Law and the State Court Rulings* ........... 9
        3.   *Sufficiency of the Evidence* .......................................... 13
            a. Unlawful Act Theory .............................................. 13
            b. Gross Negligence Theory ........................................... 15
        4.   *Ex Post Facto Implications* ........................................... 16
            a. Clearly Established Law ............................................ 17
            b. Ex Post Facto Implications of the Gross Negligence Theory .................. 18
            c. Ex Post Facto Implications of the Unlawful Act Theory .................... 19
    E.   *Right to Present a Defense (Claim II)* ........................................ 20
        1.   *Clearly Established Law* ............................................. 21
        2.   *Analysis* ........................................................ 21
    F.   *Prosecutorial Misconduct (Claim III)* ....................................... 24
        1.   *Clearly Established Law* ............................................. 25
        2.   *Analysis* ........................................................ 26
    G.   *Bad Acts Evidence (Claim IV)* ........................................... 27
        1.   *Clearly Established Law* ............................................. 27
        2.   *Analysis* ........................................................ 28
    H.   *Sentencing (Claim IV)* .................................................. 30
    I.   *Conclusion* ........................................................... 31
III.   NOTICE TO PARTIES REGARDING OBJECTIONS ..................................... 31

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Joshua M. Cole is a state prisoner, currently confined at the Parr Highway Correctional Facility in Adrian, Michigan.

2.      On March 14, 2000, petitioner was convicted of one count of involuntary manslaughter, MICH. COMP. LAWS § 750.321; and two counts of mixing a harmful substance in a drink, MICH. COMP. LAWS § 750.436(1), following a jury trial in the Wayne County Circuit Court. Petitioner was tried jointly but before separate juries with his codefendants Nicholas Holtschlag, Daniel Brayman, and Erick Limmer.  On March 30, 2000, petitioner was sentenced to consecutive terms of 7-15 years' imprisonment on the manslaughter conviction and 2½-5 years' imprisonment on each of the mixing a harmful substance convictions.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      MR. COLE'S INVOLUNTARY MANSLAUGHTER CONVICTION MUST BE VACATED BECAUSE THE EVIDENCE PRESENTED AT TRIAL WAS NOT SUFFICIENT TO SUSTAIN THE CONVICTION.

II.     THE EVIDENCE PRESENTED AT TRIAL WAS NOT LEGALLY SUFFICIENT TO SUSTAIN MR. COLE'S HARMFUL SUBSTANCE CONVICTIONS.

III.    THE TRIAL JUDGE ABUSED HER DISCRETION, AND VIOLATED MR. COLE'S DUE PROCESS RIGHT TO PRESENT A DEFENSE, BY PREVENTING THE DEFENSE FROM QUESTIONING WITNESSES ABOUT WHAT WAS COMMONLY KNOWN ABOUT THE EFFECTS OF GHB/GBL.

2

IV.    MR. COLE'S INVOLUNTARY MANSLAUGHTER CONVICTION MUST
       BE VACATED BECAUSE THE STATUTORY REQUIREMENTS FOR A
       CONVICTION OF THAT OFFENSE WERE NOT SATISFIED.

V.     MR. COLE'S PUTTING A HARMFUL SUBSTANCE IN A DRINK
       CONVICTION MUST BE REVERSED BECAUSE THE TRIAL JUDGE
       GAVE, OVER OBJECTION, AN ERRONEOUS INSTRUCTION
       REGARDING THE ELEMENTS OF THE OFFENSE BASED ON HER
       INTERPRETATION OF THE STATUTORY LANGUAGE.

VI.    SUBSTANTIAL AND MATERIAL PROSECUTORIAL MISCONDUCT
       DENIED MR. COLE HIS DUE PROCESS RIGHT TO A FAIR TRIAL
       AND COUNSEL WAS INEFFECTIVE FOR NOT OBJECTING.

VII.   THE TRIAL JUDGE ABUSED HER DISCRETION BY ADMITTING
       IRRELEVANT AND HIGHLY PREJUDICIAL BAD ACTS EVIDENCE
       OVER MR. COLE'S OBJECTION.

VIII.  THE TRIAL JUDGE ABUSED HER DISCRETION BY OVERRULING
       MR. COLE'S OBJECTION TO ALLOWING HIS JURY TO HEAR THE
       TESTIMONY OF CO-DEFENDANT DANIEL BRAYMAN.

IX.    MR. COLE IS ENTITLED TO RESENTENCING BECAUSE THE TRIAL
       JUDGE FAILED TO PROPERLY RECOGNIZE AND EXERCISE, AND
       THEREFORE ABUSED, HER DISCRETION WHEN SHE SENTENCED
       HIM TO PRISON FOR 7-15 YEARS ON THE MANSLAUGHTER
       CONVICTION BECAUSE SHE BASED HER EXERCISE OF
       SENTENCING DISCRETION ON INACCURATE INFORMATION–
       IMPROPERLY SCORED SENTENCING GUIDELINES AND A
       CLEARLY ERRONEOUS AND/OR ARBITRARY AND CAPRICIOUS
       FINDING THAT HE SHOULD NOT RECEIVE CREDIT FOR
       COOPERATING WITH THE POLICE AND HELPING THE
       COMPLAINANTS OBTAIN MEDICAL TREATMENT.

The court of appeals concluded that there was insufficient evidence to support petitioner's

conviction for involuntary manslaughter, and therefore reversed the conviction. In all other respects,

the court either found no merit to petitioner's claims or that the claims need not be addressed in light

of the court's reversal of petitioner's involuntary manslaughter conviction. *See People v.

Holtschlag*, No. 226715 , 2003 WL 1689985 (Mich. Ct. App. Mar. 27, 2003) (per curiam)

(*Holtschlag I*).

4.  The prosecutor sought leave to appeal the court of appeals's decision to the Michigan Supreme Court.  The Supreme Court reversed the court of appeals's decision, and reinstated petitioner's involuntary manslaughter conviction.  *See People v. Holtschlag*, 471 Mich. 1, 684 N.W.2d 730 (2004) (*Holtschlag II*).

5.  Petitioner sought rehearing in the Michigan Supreme Court.  In lieu of granting rehearing, the court remanded the matter to the court of appeals for consideration of the sentencing challenges he had raised in his initial brief on appeal.  *See People v. Cole*, 417 Mich. 1202, 686 N.W.2d 746 (2004).  On remand, the court of appeals rejected petitioner's sentencing challenges. *See People v. Holtschlag*, No. 226715, 2004 WL 2348253 (Mich. Ct. App. Oct. 19, 2004) (per curiam) (*Holtschlag III*).

6.  Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on March 22, 2005.  As grounds for the writ of habeas corpus, he raises four claims: (1) insufficient evidence (with a related ex post facto argument); (2) denial of his right to present a defense; (3) prosecutorial misconduct (and a related claim of ineffective assistance of counsel); and (4) trial judge abuse of discretion by improper admission of bad acts evidence and at sentencing.  In support of his claims, petitioner submitted with his application portions of his state court brief to the Michigan Court of Appeals.

7.  Respondent filed his answer on September 23, 2005.  He contends that: (1) petitioner's insufficiency of the evidence and denial of the right to present a defense claims are without merit; (2) petitioner's prosecutorial misconduct claim is procedurally defaulted; and (3)

petitioner's prior acts evidence claim is not cognizable.

        8.     Petitioner filed a reply to respondent's answer on November 3, 2005.

B.     *Factual Background Underlying Petitioner's Conviction*

        The facts underlying petitioner's convictions are succinctly summarized in the Michigan

Court of Appeals's initial decision on appeal:

> On Saturday, January 16, 1999, defendants Holtschlag and Brayman picked up three young women, Samantha, Melanie, and Jessica and took them to defendant Limmer's Grosse Ile apartment to watch television and drink alcohol. Defendants Limmer and Cole were at the apartment when the girls arrived and provided each girl with a beer. Shortly thereafter, defendant Limmer gave the group a bag of marijuana and then went into his bedroom.
>
> Later in the evening, defendant Cole asked the girls if they wanted anything more to drink and then went into the kitchen with defendants Holtschlag and Brayman. Melanie testified that she saw these three defendants in the kitchen smoking marijuana and talking. When defendants left the kitchen, defendant Holtschlag gave Samantha a Mountain Dew and defendant Brayman gave Melanie a Screwdriver. Samantha complained that her drink tasted "gross." Shortly after consuming these beverages, Samantha and Melanie passed out and began vomiting. Before passing out, Melanie recalled one of the boys asking if Samantha had a pulse. Both Melanie and Samantha had to be carried into the bathroom. They were placed on their sides to prevent choking.
>
> After being apprised of the girls' conditions, defendant Limmer told the other defendants to clean up the mess made by the girls and sent defendant Holtschlag to purchase a vacuum and carpet cleaner at a nearby store. There was evidence that the girls appeared pale and that Samantha sounded like she was have trouble breathing. Jessica testified that defendant Limmer asked defendant Cole to check Samantha's pulse but that defendant Limmer would not let them call an ambulance. The two girls were sick for several hours before they were taken to the hospital. Defendant Limmer did not go with the other defendants and Jessica to the hospital. Rather, Jessica recalled that he stayed behind and repeatedly warned them not to mention being at his apartment. Defendant Brayman claimed that defendant Cole informed him right before they left for the hospital that he had drugged the girls.
>
> When Samantha and Melanie arrived at the hospital, both were unconscious and Samantha was not breathing. In response to questioning by police and hospital personnel, defendants Holtschlag, Brayman, and Cole claimed they were at a party in Ecorse and did not say anything about drugs. In fact, these defendants drove with a police officer to show him where the alleged "Ecorse party" occurred. Samantha died as a result of her injuries and Melanie was in a coma for several hours. Blood and urine samples revealed high concentrations of GHB in the girls' systems.

Several experts testified that the levels of GHB present were sufficient to cause Samantha's death and the symptoms experienced by Melanie.

Defendant Cole subsequently admitted to police that he went with defendant Limmer to purchase a substance from a man outside a gas station in Dearborn. Upon returning to the apartment, defendant Cole stated that defendant Limmer poured twenty ounces of this substance into a glass container. He claimed that defendant Limmer told him that the substance would eat through a plastic container. Defendant Cole confessed to police that he literally poured this substance in all three of the girls' drinks. According to defendant Cole, defendants Brayman and Holtschlag were aware of this and acquiesced in the plan.

*Holtschlag I*, 2003 WL 1689985, at *1-*2, slip op. at 2-3 (footnote omitted).

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

6

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not

require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Sufficiency of the Evidence (Claim I)*

        Petitioner first contends that the evidence was insufficient to sustain his involuntary manslaughter conviction. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

        1.      *Clearly Established Law*

        The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency

of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

2.      *Involuntary Manslaughter under State Law and the State Court Rulings*

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999). Accordingly, it is necessary to examine the elements of involuntary manslaughter under Michigan law.

"In Michigan, the penalty for manslaughter is codified, but the definition is left to the common law." *People v. Datema*, 448 Mich. 585, 593, 533 N.W.2d 272, 276 (1995). In *Datema*, the court noted that "[c]ommon-law manslaughter has two broad categories: voluntary and involuntary," and further explained that the "two categories entail distinct elements and apply in different circumstances, but are often misapplied." *Id*. at 594, 533 N.W.2d at 276. Attempting to clarify the distinction between voluntary and involuntary manslaughter, the *Datema* court explained

9

that manslaughter in general is "any homicide which is neither murder nor innocent homicide, and such a killing may be either intentional or unintentional." *Id.* (internal quotation omitted). The court further explained that "[v]oluntary manslaughter is any killing with a person-endangering state of mind that is neither murder nor innocent homicide, or an unlawful homicide with a person-endangering state of mind that would be murder in the absence of mitigation." *Id.* And, the court explained, "[i]nvoluntary manslaughter is a catch-all concept including all manslaughter not characterized as voluntary[.]" *Id.*

Turning to involuntary manslaughter more specifically, the court reaffirmed its longstanding definition of the crime:

> "the killing of another without malice and unintentionally, but in doing some unlawful act not amounting to a felony nor naturally tending to cause death or great bodily harm, or in negligently doing some act lawful in itself, or by the negligent omission to perform a legal duty."

*Id.* at 595-96, 533 N.W.2d at 276 (quoting *People v. Ryczek*, 224 Mich. 106, 110, 194 N.W. 609, 611 (1923) (internal quotation omitted)). The court explained that "[t]his definition sets forth three different theories giving rise to involuntary manslaughter liability. These theories are not mutually exclusive, and, under the proper circumstances, multiple theories may be appropriate." *Id.* at 596, 533 N.W.2d at 276-77.

Applying this definition in petitioner's case, the Michigan Court of Appeals concluded that petitioner and his codefendants could not be guilty of involuntary manslaughter under either a negligence or misdemeanor-manslaughter theory. With respect to negligence, the court of appeals explained that the victim's death resulted from her ingesting an unlawful substance, and that mingling a harmful substance in a person's drink is unlawful in itself. Because involuntary manslaughter under a gross negligence theory arises from negligently doing some act lawful in itself,

10

the court reasoned, "defendants could not be convicted of involuntary manslaughter under a theory of gross negligence." *Holtschlag I*, 2003 WL 1689985, at *5, slip op. at 7. With respect to the misdemeanor-manslaughter rule, the court explained that the underlying conduct which led to the victim's death was a felony under Michigan law, and thus could not provide a basis for an involuntary manslaughter conviction. *See id*.

On appeal, the Michigan Supreme Court rejected each of these conclusions. With respect to the gross negligence theory, the court explained that the court of appeals had erred in separating unlawful act manslaughter and gross negligence manslaughter into two mutually exclusive categories. Relying on *Datema*, the court explained that the various theories of involuntary manslaughter "'are not mutually exclusive, and, under the proper circumstances, multiples theories may be appropriate.'" *Holtschlag II*, 471 Mich. at 16, 684 N.W.2d at 739 (quoting *Datema*, 448 Mich. at 596, 533 N.W.2d at 276-77). Thus, the court explained, "it is possible to determine, on the basis of specific facts at issue, that the act committed by the defendant that resulted in death was, for instance, not only unlawful, but also committed with a mens rea of gross negligence." *Id*. at 16-17, 684 N.W.2d at 739. Analyzing its previous decisions in *People v. Townsend*, 214 Mich. 267, 183 N.W. 177 (1921), *People v. Pavlic*, 227 Mich. 562, 199 N.W. 373 (1924), and *Datema*, the court explained that its prior decisions established the traditional principle that

> commission of a malum in se unlawful act that results in unintended death is sufficient in itself to constitute manslaughter; whereas an unintended death resulting from either a lawful act or a malum prohibitum unlawful act requires specific proof of a culpable means rea, which may consist of an intent to inflict bodily injury or of gross negligence showing a reckless disregard for the safety of another.

*Holtschlag II*, 471 Mich. at 19, 684 N.W.2d at 740.[1]  The court further explained its decision in

*Datema* by holding "that where an act is malum prohibitum unlawful or lawful, a mens rea of

'criminal negligence' is required to prove manslaughter, and this requirement is met if the defendant

*either* intended to inflict some bodily injury on another *or* if the defendant acted carelessly in such

a manner that manifests a reckless disregard for another's life–that is, if the defendant acted with

gross negligence."  *Id.*, 684 N.W.2d at 740-41 (citing *Datema*, 448 Mich. at 598-99, 533 N.W.2d

at 277-78).  The court concluded that it need not determine whether any other showing would have

sufficed, because in petitioner's case "the prosecutor did prove that defendants acted with a culpable

mens rea of gross negligence."  *Id.* at 20, 684 N.W.2d at 741.

The Supreme Court also disagreed with the court of appeals's resolution of the misdemeanor-

manslaughter issue.  The court began by explaining the genesis of the common-law definition of

involuntary manslaughter:

> [T]he catch-all crime of involuntary manslaughter is typically characterized in terms
> of what it is *not*, and ascertaining whether a homicide is involuntary manslaughter
> requires essentially questioning first whether it is murder, voluntary manslaughter,
> or a justified or excused homicide.  If it is none of those, then the homicide,
> generally, is involuntary manslaughter.
>      In attempting to describe the catch-all crime of involuntary manslaughter in
> terms of what it *is*, as opposed to what it is *not*, it made sense, starting in the days of
> early common law, to refer to those homicides that occurred during the commission
> of an unlawful act that was not intended to cause great bodily injury.  This is because
> . . . under traditional common law, a homicide that occurred during the commission
> of an unlawful act that was intended to cause great bodily injury constituted murder.

---

[1]A malum in se crime is a crime which is wrong in itself.  "An act is said to be *malum in se* when it is inherently and essentially evil, that is, immoral in its nature and injurious in its consequences, without any regard to the fact of its being noticed or punished by the law of the state."  BLACK'S LAW DICTIONARY 959 (6th ed. 1990).  A malum prohibitum crime, on the other hand, is "a thing which is wrong *because* it is prohibited; an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law."  *Id.* at 960.

*Holtschlag II*, 471 Mich. at 7, 684 N.W.2d at 734.  However, the court explained, in *People v. Aaron*, 409 Mich. 672, 299 N.W.2d 304 (1980), the court "formally abolished the traditional felony-murder doctrine in Michigan and held that a homicide that occurred during the commission of any crime, including a felony, constitutes murder only if the prosecutor specifically proves the existence of malice," in other words, "that the intent to commit the underlying felony by itself no longer sufficiently shows the existence of malice."  *Holtschlag II*, 471 Mich. at 9, 684 N.W.2d at 735.

Because, post-*Aaron*, "it is no longer the case that a homicide that occurs during the commission of a felony is, generally, murder per se," the court explained that it is therefore "no longer apt to describe the catch-all crime of involuntary manslaughter as encompassing crimes that occur during the commission of an unlawful act that is not a felony."  *Id*.  Noting its prior decisions describing malice as the sole element distinguishing murder from manslaughter, the court explained that

> it becomes clear that any post-*Aaron* deficiency in *Ryczeks'* description of involuntary manslaughter is not that the description fails not to expressly reference unlawful acts that *are* felonies, but rather that the description continues to reference unlawful acts that are *not* felonies.  This is because the relevant question in determining whether a homicide is murder or involuntary manslaughter is whether it occurred with malice, and not whether it occurred during the commission of an unlawful act–felony or not.  for this reason, defendants cannot opportunistically rely on *Ryczeks'* pre-*Aaron* description of the catch-all crime of involuntary manslaughter to argue that, because the homicide at issue occurred during the commission of a felony, they cannot be guilty of manslaughter.  That a "felony" has been committed is simply not dispositive in determining whether either "murder" or "manslaughter" has been committed, and, thus, the "felony" language in *Ryczeks'* manslaughter description is essentially irrelevant.

*Id*. at 10, 684 N.W.2d at 736.

3.      *Sufficiency of the Evidence*

Petitioner contends that the evidence was insufficient to establish his guilt of involuntary

13

manslaughter beyond a reasonable doubt.  The Court should disagree.

### a.  Unlawful Act Theory

With respect to the unlawful act theory of involuntary manslaughter, petitioner does not argue that the prosecution presented insufficient evidence to prove his guilt under the definitions of the offense adopted by the Michigan Supreme Court.  That is, he argues that he could not be guilty of unlawful act involuntary manslaughter not because there was insufficient evidence that he committed an unlawful act, but because as a legal matter a felony cannot support a conviction for unlawful act involuntary manslaughter.  As explained above, however, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case," *Patterson*, 432 U.S. at 211 n.12; *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney*, 421 U.S. at 691, and thus "[a] federal court must look to state law to determine the elements of the crime."  *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

As the Sixth Circuit has explained, in language worthy of complete quotation here:

> "*Jackson* establishes that states must act on the basis of sufficient evidence. The principle seems unproblematic: it is barbaric to imprison persons who no reasonable juror could think had committed a crime. Implementing *Jackson* is not so easy as stating its principle, however. Judgments represent the application of law to fact. Evidence can be "insufficient" only in relation to a rule of law requiring more or different evidence. When a state court enters or affirms a conviction, it is saying that the evidence satisfies the legal norms. These norms are for the state to select. State law means what state courts say it means. A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254. "A federal court may not issue the writ on the basis of a perceived error of state law." The difference between unreviewable legal interpretations and factual claims open under *Jackson* establishes a formidable problem of implementation.
>
> Consider four situations in which a defendant might say that the evidence is insufficient:
>
> (1) State law defines the combination of elements X, Y, and Z as criminal. (Perhaps X is killing, Y is intent to kill, and Z is lack of justification.) The prosecutor and the state courts concede that X, Y, and Z are elements of the crime and agree

with the defendant on their meaning. Defendant contends that there is no basis on which the trier of fact could find Z. The state court disagrees and convicts.

(2) Defendant believes that the combination of elements X, Y, and Z is an offense. The court disagrees, holding that the state need prove only X and Y. After a trial at which the prosecution introduces no evidence of Z, the court convicts the defendant.

(3) State law defines the combination of elements X, Y, and Z as criminal. Defendant believes that element Z can be satisfied only if the state establishes fact Z', but the state court disagrees. After a trial at which the prosecution introduces some evidence of Z but does not establish Z', the court convicts the defendant.

(4) State case law defines the combination of elements X, Y, and Z as criminal. The supreme court of the state concludes that this is an incorrect interpretation of the statute and that the prosecution need establish only X and Y. Circumstance Z, the court concludes, is an affirmative defense. After a trial at which the prosecution establishes only X and Y, the court convicts the defendant."

*Sanford v. Yukins*, 288 F.3d 855, 860-61 (6th Cir. 2002) (quoting *Bates v. McCaughtry*, 934 F.2d 99, 102 (7th Cir. 1991) (internal citations omitted)).

Petitioner's claim is a variant of scenario (2) and (3). The Michigan Supreme Court defined involuntary manslaughter to include a homicide without malice during the course of a crime, whether felony or misdemeanor. Petitioner contends that the elements of Michigan law are otherwise. This claim is not reviewable here:

"What is essential to establish an element, like the question whether a given element is necessary, is a question of state law. To say that state law 'rightly understood' requires proof of Z', and that the evidence is insufficient because the prosecution failed to establish this, is to use *Jackson* as a back door to review of questions of substantive law. Whenever courts consider that possibility expressly[,] they reject claims that convictions should be reversed because state courts misunderstood or misapplied state law. An equally firm rebuff is appropriate when the same claim appears in *Jacksonian* guise."

*Sanford*, 288 F.3d at 861 (quoting *Bates*, 934 F.2d at 103). In short, because petitioner's claim is that the Michigan Supreme Court misapplied state law, rather than that the evidence was insufficient under the law as explained by the Supreme Court, it is not a cognizable claim under *Jackson*.

15

### b. Gross Negligence Theory

With respect to the gross negligence theory, petitioner does argue that the evidence was insufficient to establish that he knew about the dangers of GHB/GBL ingestion.  Petitioner argues that the prosecution was required to show that he subjectively knew that putting the drug into the victim's drink was likely to prove disastrous or to result in serious injury.  However, the prosecution presented sufficient evidence from which petitioner's gross negligence could be inferred.  First, petitioner admitted in his statement to the police that he had previously ingested GHB.  After doing so, he vomited "all over the place," felt drunk, and passed out, waking the next morning.  *See* Pl.-Appellee's Br. on Appeal, in *People v. Cole*, No. 227941 (Mich. Ct. App.), Appx. A.  This evidence suggested that petitioner was aware of the harmful effects of the substance which he placed in the victim's drink.  Further, petitioner was present with Limmer when Limmer made the illegal purchase of the GHB, suggesting that petitioner knew it had been manufactured illegally and that its ingestion was prohibited by law.  *See* Trial Tr., dated 2/29/00, at 178-83; dated 3/1/00, at 22-24.  And, particularly damaging to petitioner's argument, the evidence showed that the victim passed out, at which time defendant checked her for a pulse, *see* Trial Tr., dated 2/23/00, at 174; dated 2/28/00, at 50, indicating an awareness that the victim's life might be in danger.  Despite this awareness, petitioner and his co-defendants did not seek immediate medical attention.  In light of petitioner's own experience with drug, his knowledge that it was an illegal substance and his plan to place it in the victims' drinks without their knowledge, and his failure to act even when it became apparent that two of the victims, and the eventual decedent, were seriously ill, a rational jury could have concluded beyond a reasonable doubt that petitioner was grossly negligent in administering the drug to the homicide victim.

16

4.    *Ex Post Facto Implications*

The heart of petitioner's claim is that in deciding his appeal, the Michigan Supreme Court altered the legal standards necessary to establish involuntary manslaughter, making his conduct retroactively unlawful in violation of ex post facto principles.  The Court should conclude that petitioner is not entitled to habeas relief on this basis.

*a.  Clearly Established Law*

The Constitution provides that "[n]o State shall . . . pass any . . . ex post facto Law[.]" U.S. CONST. art. I, § 10, cl. 1.  The classic formulation of what constitutes an ex post facto law was set forth by Justice Chase in *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798):

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.  2d. Every law that aggravates a crime, or makes it greater than it was, when committed.  3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.  4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at 390.  Thus, as the Supreme Court recently clarified, an ex post facto law is one which:  (1) punishes an act previously committed as a crime, although the act was not a crime when done; (2) increases the penalty for a crime after its commission; and (3) deprives a defendant of any defense which was available at the time the act was committed.  *Collins v. Youngblood*, 497 U.S. 37, 52 (1990); *accord Dobbert v. Florida*, 432 U.S. 282, 292 (1977); *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925).

Here, however, the Court is faced not with a law passed by the Michigan legislature, but with a judicial construction of the common law by the Michigan Supreme Court.  As the Supreme Court has explained, "[t]he Ex Post Facto Clause is a limitation upon the powers of the Legislature, and

17

does not of its own force apply to the Judicial Branch of government." *Marks v. United States*, 430 U.S. 188, 191 (1977); *accord Rogers v. Tennessee*, 532 U.S. 451, 460 (2001) ("The *Ex Post Facto* Clause, by its own terms, does not apply to courts."). Rather, "limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process." *Rogers*, 532 U.S. at 456. These due process limitations on ex post facto judicial decisionmaking "rest[] on core due process concepts of notice, foreseeability, and, in particular, the right of fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct." *Id.* at 459. However, the Court has not "go[ne] so far as to incorporate jot-for-jot the specific categories of *Calder* into due process limitations on the retroactive application of judicial decisions." *Id.* In the context of common law adjudication, "a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning . . . where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Id.* at 462.

### b. Ex Post Facto Implications of the Gross Negligence Theory

With respect to the unlawful act theory of involuntary manslaughter, petitioner cannot show that the Michigan Supreme Court made any retroactive change to the law, much less one that was unexpected and indefensible by reference to the law which existed at the time of his conduct in 1999.[2] In *Datema*, which predated petitioner's conduct by about four years, the Michigan Supreme Court discussed several early cases and, from these cases, concluded that "the law of Michigan has long provided that where a defendant commits an *unlawful act* that is malum prohibitum or a lawful

---

[2]Although the Michigan Supreme Court addressed petitioner's ex post facto argument with respect to the unlawful act theory, it did not do so with respect to the gross negligence theory, as petitioner did not explicitly argue the ex post facto implications of the gross negligence theory in his brief.

act executed negligently that causes death, involuntary manslaughter may be premised on criminal negligence." *Datema*, 448 Mich. at 597, 533 N.W.2d at 277 (emphasis added). Specifically, in *Datema* the court held, notwithstanding the traditional formulation of the gross negligence theory as encompassing lawful acts committed in a negligent manner, that "[a]n unlawful act committed with the intent to injure or in a grossly negligent manner that proximately causes death is involuntary manslaughter." *Id*. at 606, 533 N.W.2d at 281. Thus, it was clear after *Datema* that, under Michigan law, gross negligence involuntary manslaughter can be established based on any act negligently performed, regardless of whether the act was lawful or unlawful, so long as the requisite mens rea (*i.e.*, gross negligence or intent to injure) is established. Thus, the Supreme Court's decision in petitioner's case did not retroactively alter the standards for assessing criminal liability under the gross negligence theory of involuntary manslaughter. Petitioner has therefore failed to establish a due process violation based on ex post facto principles.

### c. *Ex Post Facto Implications of the Unlawful Act Theory*

At the outset, the Court need not resolve whether the Supreme Court's alteration in petitioner's case of the misdemeanor-manslaughter rule to encompass felonies violates the ex post facto principles protected by the Due Process Clause, because the clearly permissible gross negligence theory is sufficient in itself to sustain petitioner's conviction. Nevertheless, although it is a closer question than the gross negligence theory, petitioner is likewise not entitled to habeas relief with respect to the unlawful act theory.

As noted above, the question is whether the Supreme Court's alteration of the unlawful act theory to include felonies represented an unexpected and indefensible alteration of the statute. Petitioner cannot make this showing. As the court explained, it is long been held by the Michigan

19

courts that the single distinguishing characteristic between murder and manslaughter is the existence of malice. *See Holtschlag II*, 471 Mich. at 9-10, 684 N.W.2d at 735-36 (discussing *Aaron*, *People v. Austin*, 221 Mich. 635, 192 N.W. 590 (1923), and *People v. Mendoza*, 468 Mich. 527, 664 N.W.2d 685 (2003)). And, once the court in *Aaron* did away with the felony murder rule, which found malice solely on the basis of the commission of an underlying felony, any rationale for limiting unlawful act manslaughter to misdemeanors evaporated. Further, as the court explained in *Datema*, involuntary manslaughter has long been described by the Michigan courts as a catch-all covering all homicides which are not murder, voluntary manslaughter, justified, or excused. And, to contend that petitioner did not have fair warning, the Court would have to conclude that a reasonable person would have looked at the state of the law following *Aaron* and concluded that he could kill with impunity so long as he did so in the course of felony but without malice, where the same killing would have been unlawful if committed in the course of a less serious crime constituting only a misdemeanor. In light of the absurdity of this result, the Michigan courts' repeated description of involuntary manslaughter as a catch-all category of homicide, and the changes in the felony-murder rule wrought by *Aaron*, the court's decision in petitioner's case explicitly recognizing the availability of the unlawful act theory where a felony, rather than a misdemeanor, is involved is "[f]ar from a marked and unpredictable departure from prior precedent[.]" *Rogers*, 532 U.S. at 467. Rather, it "was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense." *Id*. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this

claim.[3]

E.      *Right to Present a Defense (Claim II)*

Petitioner next contends that the trial court denied him his right to present a defense by prohibiting his counsel from eliciting, on cross-examination of the prosecution's expert witnesses, whether the dangers posed by GHB and GBL were commonly understood by lay people.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law.  Implicit in these provisions is the right to present a meaningful defense.  As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact.  The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408.  Although the right

_____

[3]As noted above, if the Court disagrees with my conclusion regarding the unlawful act theory, petitioner is still not entitled to habeas relief because the gross negligence theory does not raise any ex post facto concerns and is sufficient in itself to sustain petitioner's voluntary manslaughter conviction.

to present a defense is fundamental, it is not absolute. Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

2.    *Analysis*

During cross-examination of several of the prosecution's expert witnesses, petitioner's counsel sought to elicit information concerning the extent to which the dangers of GHB and GBL were known to the general public. In each of these instances, the prosecutor objected on relevance grounds, and the trial court sustained the prosecutor's objection. *See, e.g.*, Trial Tr., dated 2/15/00, at 51-53; Trial Tr., dated 2/16/00, at 216-18; Trial Tr., dated 3/1/00, at 76-77, 115-16. On appeal petitioner contended, as he does here, that these rulings denied him his constitutional right to present a defense.[4] The Michigan Court of Appeals rejected this claim, although it did not rely on the relevance basis that the trial court had used in sustaining the prosecutor's objection. The court of appeals concluded that "there is nothing on the record to indicate that the *general public's awareness* of GHB/GBL was within the expertise or realm of knowledge of these expert witnesses. The burden was on defendants, as the parties seeking admission of the testimony, to establish a proper foundation." *Holtschlag I*, 2003 WL 1689985, at *9, slip op. at 10. The Court should

---

[4]Petitioner's argument, both in the state court and here, is limited to a claim that the trial court violated his general right to present a defense. He has not argued that the trial court's limitation of counsel's cross-examination violated his more specific right under the Sixth Amendment to confront the witnesses against him.

conclude that petitioner is not entitled to habeas relief on this claim.

At trial, petitioner's counsel attempted to question three prosecution witnesses, Dr. Harlan Mast, Mark Paolella, and Duane Satzger, about the public's awareness of the dangers of GHB/GBL. *See* Trial Tr., dated 2/16/00, at 216-18; dated 3/1/00, at 76-77, 115-16. However, petitioner offered nothing in the state courts, and nothing here, to show that these witnesses were qualified to give this testimony. Dr. Mast was qualified as an expert in emergency medicine, *see* Trial Tr., dated 2/16/00 at 110, and gave testimony concerning the treatment of the victim, her symptoms, the presence of GHB in her blood, and the general characteristics of GHB, *see id*. at 121-221. Mark Paolella, a special agent with the Food and Drug Administration, was not qualified as an expert in any field, and testified solely with respect to the testing for GHB performed on items recovered by the police. *See* Trial Tr., dated 3/1/00, at 58-67. Duane Satzger, a forensic chemist, was qualified as an expert in forensic chemistry, *see id*. at 91, and testified about the testing of items recovered in Limmer's apartment for the presence of GHB, *see id*. at 94-115. Petitioner has offered nothing to contradict the court of appeals's conclusion that the record fails to establish that these experts were qualified to give the testimony which petitioner sought to elicit.

"A policy which aims at preventing the use of unreliable or misleading expert evidence in criminal trials is far from arbitrary. Accordingly, a court may constitutionally enforce evidentiary rules to limit the evidence an accused (or for that matter any party) may present in order to ensure that only reliable opinion evidence is admitted at trial." *United States v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004). Here, petitioner's "right to put on a meaningful defense did not include the unfettered and unreviewable opportunity to present all expert opinion, even if it did not meet the basic requirements for admissibility found in Rule 702." *Id*. Because petitioner has not established

that the prosecution witnesses were qualified to testify about the general public's awareness of the dangers of GHB, petitioner was not denied his right to present a defense by the exclusion of this testimony.  *See id.*; *United States v. Thabateh*, 40 Fed. Appx. 392, 395 (9th Cir. 2002).

Further, to constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused."  *Scheffer*, 523 U.S. at 308.  A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged."  *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315).  Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court).

Here, petitioner cannot show that the witnesses' purported testimony concerning the public's awareness of the dangers of GHB could have created a reasonable doubt which did not otherwise exist.  With respect to the unlawful act theory, neither the general public's nor petitioner's own awareness was relevant; all that was required was for the prosecution to show that the victim's death occurred during the commission of an unlawful act.  With respect to the gross negligence theory, petitioner's own knowledge was relevant, but it is difficult to see how evidence regarding the public's knowledge concerning GHB in general would have detracted from the prosecutor's case, in light of the evidence that petitioner himself had experienced the dangerous side effects of GHB ingestion, as well as the evidence that petitioner knew the victim was in peril but still delayed

24

seeking medical help.  Thus, under either the unlawful act theory or the gross negligence theory, either of which alone is sufficient to sustain petitioner's conviction, testimony from the witnesses regarding the public's awareness of the dangers of GHB would not have created a reasonable doubt that did not exist in the absence of this testimony.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Prosecutorial Misconduct (Claim III)*

In his third claim, petitioner contends that he was denied a fair trial by the prosecutor's improper argument during rebuttal arguments.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.[5]

1.    *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* (internal quotation omitted).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability

---

[5]Respondent contends that this claim is barred by petitioner's procedural default in the state court due to petitioner's failure to object to the comments at trial.  However, petitioner contends that counsel was ineffective in failing to object.  If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To demonstrate that counsel was ineffective petitioner must show, *inter alia*, that he was prejudiced by counsel's actions, which in turn requires an examination of the merits of the objection, *i.e.*, the merits of the habeas claim.  Given that the cause and prejudice inquiry merges with analysis of the merits of petitioner's defaulted claim, it is better to simply consider the merits of this claim, which I do below.  *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims were inquiry into the merits mirrored cause and prejudice inquiry).

of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial."  *Id*. (internal quotation omitted).

2.     *Analysis*

During rebuttal argument, the prosecutor recited a poem that had been written by the victim:

> I always thought that when it came I'd be ready for the end.  By that time, I'd be resigned and tame.  Death would appear a welcome friend.
> But what if I still want to live, still want to learn and grow?
> What if I still have gifts to give and I'm not yet ready to go?
> What if I'm still too young, still not old enough to die?
> What if I want to wait until I have experienced life to say good-bye?

Trial Tr., dated 3/7/00, at 95-96.  The prosecutor concluded his rebuttal by arguing:

> [W]e want a verdict that at least holds those accountable who took that life before its time.
> [Defense counsel] said well there is nothing you can do about it.  Well, yeah, there is something you can do about it.  And you're the only people on earth that can do something about it now.  And that at least declares his responsibility for that act that it wasn't some meaningless accident.
> And that would be a verdict of guilty as charged.  And I think justice requires it.

*Id*. at 96.  Petitioner contends that these comments constituted an improper appeal to the jury's sympathy.

With respect to the first comment, reciting the victim's poem, this comment was arguably

26

improper. It was not an argument based on the evidence, and the only purpose it appears to serve is to generate sympathy for the victim. However, as explained above, it is not enough for petitioner to show that the comment was improper. He must also show that the comment deprived him of a fair trial. Here, petitioner cannot make this showing. As explained above, there was significant evidence that petitioner contributed to the victim's death during the commission of an unlawful act, and that he was grossly negligent in his actions toward the victim. In the context of this evidence, the prosecutor's single improper comment did not deprive petitioner of a fair trial. *United States ex. rel. Rockman v. DeRobertis*, 717 F. Supp. 553, 569-70 (N.D. Ill. 1989) (prosecutor's reference to victim "in his grave crying out for a guilty verdict" did not deprive petitioner of a fair trial); *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 896-96 (E.D. Ky. 1988) (petitioner was not denied a fair trial where, during the guilt-innocence phase of the trial, the prosecutor admonished the jury not to forget the victim because "he had a right to live."), *rev'd on other grounds*, 919 F.2d 1091 (6th Cir. 1999)(en banc).

With respect to the second comment, petitioner cannot show that the prosecutor's argument was improper. The prosecutor's argument was a response to defense counsel's closing argument, in which counsel argued that the victim's death was an unfortunate accident, but not a crime. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986)(one factor in evaluating claims of prosecutorial misconduct is whether the prosecutor's statements were "invited by or was responsive" to the defense.). Further, the comment did not appeal to either the jury's sympathy or sense of civic duty. Rather, the prosecutor merely explained to the jury that, contrary to defense counsel's argument, petitioner's actions did amount to a crime and that something, in fact, could be done about the crime by holding petitioner accountable. This comment was not improper. Accordingly, the Court should

27

conclude that petitioner is not entitled to habeas relief on this claim.

G.      *Bad Acts Evidence (Claim IV)*

Petitioner next contends that he was denied a fair trial by the introduction of prior bad acts evidence.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws).  Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution."  *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection

28

or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

    2.   *Analysis*

At trial, Jodie Straight testified for the prosecution that Limmer and Holtschlag were involved in marijuana distribution, that she never saw people in Limmer's apartment who were as old as Limmer, that Limmer often supplied marijuana on the occasions when she was at his apartment, and that Limmer told her that he could get her any type of drug that she needed. *See* Trial Tr., dated 2/17/00, at 212-20. The only testimony from Straight which related to petitioner indicated that she had met him once in mid-September. Petitioner was in Limmer's car when Limmer picked her up, and Limmer dropped petitioner off at his mother's house. *See id*. at 220-22. Petitioner argued in the state courts, as he does here, that the trial court erred in permitting his separate jury to hear this testimony. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Much of petitioner's argument in the state court briefs which he attaches to his petition focuses on the prosecutor's alleged failure to provide notice as required by Rule 404(b)(2). To the extent that petitioner is asserting this argument as a basis for habeas relief, his claim raises solely an issue of state law which is not cognizable on habeas review. *See Richardson v. Evans*, 99 F. 3d

1150, 1996 WL 603278, * 3 (10th Cir. October 22, 1996); *Doss v. Bock*, No. 00-10030, 2002 WL

1554363, * 13 (E.D. Mich. July 15, 2002) (Lawson, J.) (prosecutor's alleged failure to give prior

notice of intent to introduce evidence of defendant's and other witnesses' wrongful acts did not rise

to level of a due process violation).

Likewise, to the extent that petitioner challenges the substantive admissibility of the

evidence, the claim is without merit. Both the Supreme Court and the Sixth Circuit have repeatedly

held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is

relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S.

342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v.

Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507

F.2d 889, 893-95 (6th Cir. 1974). And even assuming that the testimony was not relevant as to him,

petitioner cannot show that he was prejudiced by the introduction of the evidence. First, Straight's

testimony did not in any way implicate petitioner in Limmer's alleged drug dealing, or otherwise

describe any bad conduct on the part of petitioner. Second, as explained by the court of appeals, the

properly admitted evidence showed that

> Limmer provided the group with a bag of marijuana on the night in question.
> Moreover, testimony established that the girls went with defendants Holtschlag and
> Brayman to get marijuana before going to defendant Limmer's apartment. Thus, the
> majority of Ms. Straight's testimony was not significantly different from the drug
> activities that took place at the apartment that night.

*Holtschlag I*, 2003 WL 1689985, at *8, slip op. at 10. Because the other acts evidence did not

implicate petitioner, and was essentially cumulative of the properly admitted evidence, petitioner

cannot show that he was denied a fair trial by the admission of the evidence. Accordingly, the Court

should conclude that petitioner is not entitled to habeas relief on this claim.

H.       *Sentencing (Claim IV)*

Finally, petitioner raises several challenges to his sentence.  Specifically, he claims that the trial judge erred in: (1) scoring several offense variables under the sentencing guidelines; and (2) failing to give petitioner credit for cooperating with the police and helping the victim's obtain medical treatment.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

As a general matter, a habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings.  *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987).  Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993).  Petitioner's claim that the court improperly scored the guidelines range raises an issue of state law not cognizable on habeas review.  *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also*, *Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review).

Likewise, petitioner's claim that the trial judge inappropriately failed to take into consideration his remorse and cooperation raises a state law claim not cognizable on habeas review.  *See Lacy v. Sullivan*, No. 94-2909, 1996 WL 89244, at *1 (7th Cir. Mar. 1, 1996); *Johnson v. Lumpkin*, 769 F.2d 630, 634 (9th Cir. 1985).  Accordingly, the Court should conclude that petitioner

31

is not entitled to habeas relief on his sentencing claims.

I.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 12/15/06

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record by electronic
means or U.S. Mail on December 15, 2006.

s/Eddrey Butts
Case Manager